J-A03033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SANDRA COOPER, IN HER OWN RIGHT AND AS ADMINISTRATRIX OF THE ESTATE OF GENE M. COOPER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ARMSTRONG WORLD INDUSTRIES, INC., ALAN J. HAY, M.D. | |
| Appellees | No. 632 EDA 2015 |

Appeal from the Order Entered February 2, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): August Term, 2013, No. 02452

| | |
|---|---|
| SANDRA COOPER, IN HER OWN RIGHT AND AS ADMINISTRATRIX OF THE ESTATE OF GENE M. COOPER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| ARMSTRONG WORLD INDUSTRIES, INC., ALAN J. HAY, M.D. | |
| Appellees | No. 633 EDA 2015 |

Appeal from the Order Entered February 2, 2015
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 2452 August Term, 2013

BEFORE:  GANTMAN, P.J., MUNDY, J., and DUBOW, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JULY 15, 2016**

Appellant, Sandra Cooper, in her own right and as administratrix of the

Estate of Gene M. Cooper, appeals from the orders entered in the Philadelphia County Court of Common Pleas, which granted summary judgment in favor of Appellees, Armstrong World Industries, Inc. (Appellee AWI) and Alan J. Hay, M.D. ("Appellee Hay").  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we will only briefly summarize them.  In September 2003, a chemical spill occurred at Appellee AWI's plant in Lancaster, Pennsylvania.  Gene M. Cooper ("Mr. Cooper") was an employee of Appellee AWI and one of the workers assigned to clean up the spill.  Mr. Cooper developed a cough and severe sinus pain immediately after his involvement in the cleanup.  Within several months of the cleanup, Mr. Cooper began a cognitive decline.

When his cognitive issues interfered with his work, Appellee AWI referred Mr. Cooper to Appellee Hay for an evaluation.  After evaluating Mr. Cooper, Appellee Hay contacted Mr. Cooper's primary physician, who ordered neurological testing to diagnose Mr. Cooper's condition.  Due to Mr. Cooper's substantial cognitive issues, Appellee AWI placed Mr. Cooper on disability in May 2004.  Over the next several years, Mr. Cooper's condition rapidly deteriorated.  The court deemed Mr. Cooper a totally incapacitated person in June 2006.  As Mr. Cooper's then court-appointed legal guardian, Appellant subsequently placed Mr. Cooper in a full-time assisted living facility.  After multiple evaluations of Mr. Cooper by many different doctors,

Mr. Cooper was diagnosed in November 2007, with work-related encephalopathy with consequent dementia.

In December 2007, Appellant filed a worker's compensation claim on Mr. Cooper's behalf, which asserted that Mr. Cooper had developed encephalopathy with dementia after toxic overexposure at work. During the course of the worker's compensation case, Appellant requested Mr. Cooper's chemical exposure documentation from Appellee AWI. Appellee AWI supplied some of the pertinent information, but it claimed the rest of Mr. Cooper's relevant chemical exposure documentation had been inadvertently lost or destroyed during a move to a new building. Appellant learned for the first time, in 2009, of Appellee Hay's evaluation of Mr. Cooper in 2004. After numerous additional evaluations of Mr. Cooper by doctors, Appellant learned that Mr. Cooper's prognosis was poor and his injury was the result of "occupational solvent exposure." In October 2011, Appellant learned from an employee of Appellee AWI that Mr. Cooper's chemical exposure documentation was stored on Appellee AWI's computer system.

In the worker's compensation action, the court determined Mr. Cooper suffered from toxic encephalopathy caused by chronic solvent and chemical exposure and acute exposure to toxic chemicals while working at Appellee AWI's manufacturing plant. As a result, in 2012, the court awarded Mr. Cooper compensation benefits, interest, attorney's fees, litigation costs, and medical expenses incurred for the treatment of his toxic encephalopathy.

On August 22, 2013, Appellant filed a tort action against Appellees. On October 9, 2013, Appellant filed an amended complaint, which raised claims of fraud, conspiracy, recklessness, negligent infliction of emotional distress, and intentional infliction of emotional distress. Appellee AWI and Appellee Hay filed preliminary objections on October 28, 2013, and October 29, 2013, respectively. The court overruled both Appellees' preliminary objections on November 29, 2013. Appellee Hay then filed an answer and new matter to Appellant's complaint on December 30, 2013, and Appellee AWI filed an answer and new matter on January 8, 2014. Mr. Cooper died on February 5, 2014.

On October 22, 2014, Appellant and her children filed a wrongful death and survival action against Appellees. On October 25, 2014, Appellant filed a motion to consolidate the 2013 tort action with the wrongful death and survival action pursuant to Pa.R.C.P. 213(e)(1), which the court granted by order dated November 26, 2014.

On December 1, 2014, both Appellees filed motions for summary judgment in the 2013 tort action alleging, *inter alia*, the relevant statutes of limitation barred Appellant's claims raised in that action. After Appellant filed answers to Appellees' motions for summary judgment, the court granted summary judgment on January 21, 2015, in favor of both Appellees on Appellant's negligent infliction of emotional distress and intentional infliction of emotional distress claims and Appellee Hay on Appellant's

recklessness claim. The court then granted summary judgment in favor of Appellees on all of Appellant's remaining claims in the 2013 tort action by order dated January 30, 2015, and docketed February 2, 2015. On February 10, 2015, Appellant filed a notice of appeal from the court's order granting summary judgment in favor of Appellees. The court ordered Appellant on February 11, 2015, to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant complied on March 2, 2015.

On May 17, 2016, we quashed the appeal, based on this Court's decision in **Malanchuk v. Tsimura**, 106 A.3d 789 (Pa.Super. 2014) (*en banc*), which defined the order on appeal as a non-final order; that case was then pending review before the Pennsylvania Supreme Court. In the wake of our Supreme Court's reversal, however, we promptly withdrew our disposition and *sua sponte* granted reconsideration of this appeal on May 26, 2016. **See Malanchuk v. Tsimura**, ___ A.3d ___, 2016 WL 3022688 (Pa. filed May 25, 2016) (holding: where court consolidates two actions pursuant to Pa.R.C.P. 213, cases retain their separate identities and require distinct judgments unless complete consolidation is achieved; complete consolidation occurs only when both actions involve same parties, subject matter, issues, and defenses; absent complete consolidation, judgment entered in one case is final, and party is entitled to immediate appeal as of right). Because the trial court had consolidated this 2013 tort action with a wrongful death and

survival action that involves different parties and diverse claims, complete consolidation did not occur. *See Kincy v. Petro*, 606 Pa. 524, 531, 2 A.3d 490, 494 (2010). Thus, Appellant is entitled to an appeal as of right from the trial court's order granting summary judgment in the present case, and this appeal is properly before us. *See Malanchuk, supra*.

Appellant raises one issue for our review:

> DID THE [TRIAL] COURT IMPROPERLY INTRUDE UPON THE PROVINCE OF THE FACT-FINDER BY CONCLUDING THAT THE COOPERS HAD NOT EXERCISED REASONABLE DILIGENCE AND THUS RENDERING THE DISCOVERY RULE INAPPLICABLE TO THE STATUTE OF LIMITATIONS FOR FRAUD AND CONSPIRACY?

(Appellant's Brief at 4).

Our standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law. *Mee v. Safeco Ins. Co. of Am.*, 908 A.2d 344, 347 (Pa.Super. 2006).

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa.Super. 2000) (internal citations omitted). Our scope of review is plenary. *Pappas v. Asbel*, 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001), *cert. denied*, 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002). In reviewing a trial

court's grant of summary judgment,

>[W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.
>
>Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [a] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense.
>
>Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

**Chenot v. A.P. Green Services, Inc.**, 895 A.2d 55, 61 (Pa.Super. 2006)

(internal citations and quotation marks omitted).

After a thorough review of the record, the briefs of the parties, the

applicable law, and the well-reasoned opinion of the Honorable Ellen Ceisler, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed May 20, 2015, at 17-24) (finding: Appellant's claim that discovery rule tolled statute of limitations until Mr. Cooper's autopsy revealed exact nature of Mr. Cooper's illness fails because perfect or near-perfect diagnosis was not required to trigger statute of limitations; likewise, lack of complete or exact diagnosis did not toll statute of limitations for purposes of discovery rule; Appellant was aware, as early as September 25, 2003 (when Mr. Cooper told Appellant about cleanup of spill at work) and no later than November 2, 2010 (when Appellant received letter about Mr. Cooper's illness and prognosis), that Mr. Cooper sustained serious injury due to "occupational solvent exposure"; further, Appellant's claim that discovery rule should toll statute of limitation, because Appellees "fraudulently" withheld critical documents, was undermined because (a) Appellant knew as early as December 2005 that Appellee AWI was withholding exposure documents in violation of Occupational Safety and Health Act ("OSHA"), (b) Appellant learned in 2009 that Appellee Hay had assessed Mr. Cooper in May 2004, and had failed to provide his notes to Appellant during intervening time, and (c) between 2005 and 2010, no less than eight doctors informed Appellant that Mr. Cooper suffered from work-induced toxic encephalopathy and dementia; these facts establish that

Appellant had actual or constructive notice between 2005 and 2010 that: (a) Appellee AWI's denial of Appellant's request for Mr. Cooper's exposure records violated OSHA and prevented Appellant's timely access to Mr. Cooper's exposure information, (b) Appellees hid from Appellant Dr. Hay's involvement with Mr. Cooper, and (c) Mr. Cooper's progressively deteriorating state was linked to 2003 chemical spill and other exposure to chemicals at Appellee AWI's plant; in light of Appellant's notice of these facts, November 2, 2010, was last possible date Appellant knew or should have known, through exercise of due diligence, about Appellees' tortious conduct; pursuant to discovery rule, two-year statute of limitations began to run on this date at the latest and required Appellant to file suit no later than November 2, 2012; Appellant did not file present tort action until August 22, 2013, nearly ten months beyond applicable deadline; thus, Appellant's claims are time-barred, and court properly granted Appellees' motions for summary judgment).

We agree with the court's decision but write separately to emphasize the following points. First, the record discloses no dispute over whether Mr. Copper suffered chronic solvent and chemical exposure and acute exposure to toxic chemicals while working at Appellee AWI's manufacturing plant. Appellant's fraud complaint does not allege that Appellee AWI denied the direct connection between Mr. Cooper's toxic exposure and his medical diagnosis, deteriorating health, and death. Likewise, Appellant's fraud

complaint does not allege what additional information was needed for Mr. Cooper's diagnosis or how his diagnosis and treatment would have changed or how the additional documents, on which the fraud claim rests, would have altered the nature or cause of the workplace injury Mr. Cooper suffered. The documents at issue purport to reveal additional information on the extent or degree of Mr. Cooper's exposure, which is not material to a statute of limitations argument in the present context. Moreover, Appellant did not assert that AWI intentionally exposed Mr. Cooper to the toxic solvents which caused Mr. Cooper's health problems. Instead, the intentional tort Appellant asserted against Appellees centered on the alleged withholding of certain documentation regarding the extent of Mr. Cooper's chemical exposure, although Appellant already knew about the exposure. In this respect, the trial court's analysis deserves to be directly quoted as follows:

> In support of [the] effort to defeat the…summary judgment motions, [Appellant] attempted to rebut [Appellees'] statute of limitations argument by raising both the discovery rule and the fraudulent concealment doctrine, in essence maintaining that there are genuine issues of material fact as to whether the filing window was tolled, and whether their suit was thus initiated in a timely fashion. First, [Appellant] claimed that it was not possible to ascertain the precise nature of Mr. Cooper's injuries until he was autopsied at some point in 2014. Second, [Appellant] argued that AWI and [Dr.] Hay conspired in a series of [still ongoing] fraudulent acts, intentional omissions, and deliberate [record] destruction, which (depending on which of [Appellant's] filings one happens to be reading) prevented [Appellant] from learning of AWI's alleged duplicity until October 2011 or December 2011 and, independent of the federal preemption argument, continues to toll the statute of limitations.

Unfortunately, neither of these arguments provided a sufficiently substantive counter to [Appellees'] requests for relief. Regarding the former, actual notice of an injury via a perfect, or nearly perfect, diagnosis is not required for a relevant statute of limitations to run, and a lack thereof does not, in itself, toll the period for filing suit; thus, the fact that [Appellant] may not have known the exact nature of Mr. Cooper's malady until after his post-mortem examination is irrelevant, especially when the Coopers were aware as early as September 25, 2003 (*i.e.* the date of the Top Foam spill), and no later than Dr. Martin's November 2, 1010 assessment letter to the Coopers' attorney (which itself merely reinforced the diagnoses offered by Drs. Chaudhry, Cho, Fochtman, Gold, Gur, Newberg, and Thrasher), that Mr. Cooper had sustained a serious injury due to "occupational solvent exposure."[46] As to the latter, though the Coopers claimed that both AWI and Dr. Hay fraudulently withheld (and continue to withhold) critical documentation regarding Mr. Cooper's workplace exposure to chemicals, whatever merit this argument may have is undermined by a triumvirate of details: First, the Coopers requested these exposure records as early as December 2005, only to be refused by AWI, even though [OSHA] explicitly requires employers to provide such documentation, upon request, to affected employees; second, [Appellant] became aware in 2009 that Dr. Hay had assessed Mr. Cooper during a May 2004 office visit, allegedly doing so without her knowledge, and had not provided either of the Coopers with his related notes during the intervening time; third, between November 17, 2007 and November 2, 2010, the Coopers were informed by no less than eight separate doctors that Mr. Cooper suffered from work-induced toxic encephalopathy and dementia. Thus, even when viewing the case record in the light most favorable to the Coopers, it is evident that they gained actual or constructive notice, at various points between late 2005 and late 2010, that: (1.) AWI had violated [OSHA] by denying their initial…requests for Mr. Cooper's chemical exposure history, and had therefore prevented the Coopers from obtaining such information in a timely manner; (2.) Dr. Hay's involvement in this matter had been hidden from [Appellant] for roughly five years after Mr. Cooper's 2004

- 11 -

office visit; and (3.) Mr. Cooper's progressively deteriorating state, on both a mental and physical level, was inextricably linked to his participation in the Top Foam spill cleanup, as well as to decades of chronic exposure to solvents and other chemicals at the Facility. Accordingly, this [c]ourt determined that there was no genuine issue of material fact as to the latest possible date upon which the Coopers knew, or should have known, each of these facts, and thus be put on notice of Appellees' allegedly fraudulent and conspiratorial conduct: November 2, 2010 (*i.e.* the date of Dr. Martin's letter).

> [46] Moreover, …given the [Workers' Compensation Act's] near-blanket prohibition against common law actions based upon workplace injuries, the injuries allegedly caused to Mr. Cooper by the Top Foam spill, standing alone, could not form the foundation of a permissible [common law tort] suit.

(Trial Court Opinion at 22-24) (most internal citations, footnotes, and quotation marks omitted). The record supports the court's analysis, which we accept. Accordingly, we affirm on the basis of the trial court's opinion and our additional commentary.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2016

- 12 -

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

|  |  |  |
|---|---|---|
| SANDRA COOPER, IN HER OWN RIGHT, | : | **SUPERIOR COURT** |
| AND AS PLENARY GUARDIAN OF GENE M. | : | **632 EDA 2015** |
| COOPER, and GENE M. COOPER | : | **633 EDA 2015** |
| Plaintiffs-Appellants | : |  |
|  | : | **COURT OF COMMON PLEAS** |
|  | : | **130802452** |
| **v.** | : |  |
|  | : |  |
| ARMSTRONG WORLD INDUSTRIES, INC. | : |  |
| and DR. ALAN J. HAY, M.D. | : |  |
| Defendants-Appellants | : |  |
|  | : |  |

**OPINION**

**ELLEN CEISLER, J.**                    **DATE: May 20, 2015**

---

## I.    FACTS AND PROCEDURAL HISTORY

The instant appeals, filed by Plaintiffs-Appellants Sandra Cooper and Gene M. Cooper ("Mrs. Cooper," "Mr. Cooper," or, collectively, "The Coopers"), emanate from this Court's orders, docketed on February 2, 2015, granting Defendants-Appellants Armstrong World Industries, Inc. and Dr. Alan J. Hay's ("AWI" and "Dr. Hay," individually, and collectively "Appellees") respective Motions for Summary Judgment. As will be discussed at length *infra*, this Court respectfully maintains that the claims contained in the Coopers' suit are barred by the relevant statute of limitations, meaning that this Court properly granted summary judgment in favor of both AWI and Dr. Hay, and that the Coopers' appeals should therefore be denied.

Cooper Etal Vs Armstrong World Industries -OPFLD



1

13080245200158

AWI, a flooring and ceiling manufacturer located in Lancaster, PA,[1] hired Mr. Cooper in April 1974, initially assigning him to warehouse operations in its Lancaster facility ("Facility").[2] AWI's Motion for Summary Judgment, Ex. D Part I at 17 ("AWI MSJ"). Subsequently, Mr. Cooper took an extended leave of absence starting in 1975, during which he served in the Armed Forces and, in addition, married Mrs. Cooper. Id. at 17, 25. He returned to AWI in October 1979, spending the bulk of the ensuing decades working in various capacities throughout the Facility,[3] and eventually became a lead product inspector in AWI's "Corlon" department. Id. at 15, 17, 19. As a consequence of his time working at AWI, Mr. Cooper was regularly exposed to industrial cleaning solvents of varying toxicity, as well as certain inks that were used in the flooring manufacturing process. Id. at 12-15, 22.

While this low-level exposure may have had, in the aggregate, some negative impact on Mr. Cooper, see AWI MSJ, Ex. D Part I at 27 (Mrs. Cooper stating that, starting at some point in 2000, Mr. Cooper began to be regularly, and inexplicably, irritable), the true tipping point was in September 2003, when a major chemical spill occurred at the Facility. On September 25, 2003, a valve on a tank located within the Facility's Building 94, on the #6 Coating Line of AWI's rotogravure division, was improperly left open by an AWI employee, allowing roughly 500 or more gallons of "Top Foam"[4] to spill out into the production area and the basement below. Id. at 31-32; Amended Complaint at 5. Though Mr. Cooper was working in AWI's Corlon department, at Table 10 in the Facility's Building 200, this spill was of a magnitude necessitating an "all

---

[1] See generally Home, AWI Licensing Company, 2015, http://www.armstrong.com/ (AWI's website, which shows AWI's location, as well as the nature of its business operations).

[2] At one point, AWI's Lancaster operations contained "five different production areas," which sprawled over an area 110 acres in size that contained 220 buildings; however, due to downsizing and related layoffs, all that remains today is AWI's rotogravure department, which is responsible for printing certain kinds of flooring products. AWI's Motion for Summary Judgment, Ex. D Part I at 17.

[3] Mr. Cooper graduated from Millersville College (now Millersville University) in 1989, earning a bachelor's degree in business and finance, and later "took courses [though Villanova University] toward[s] insurance certification [and] selling securities," though he did not obtain enough credits to sit for the Series 7 licensing exam. AWI's Motion for Summary Judgment, Ex. D Part I at 25-26.

[4] According to Harold Zorger, an AWI employee, Top Foam "is the gel that [AWI coating department employees] put on the top layer of [AWI] flooring [and is] made out of... paste, plastisols and sawdust," as well as an industrial solvent known as "Solvesso" and arsenic. AWI's Motion for Summary Judgment, Ex. D Part I at 32-33; see also id. at 23 (description of Solvesso's ingredients, as well as its potential health hazards). AWI creates a "finished linoleum flooring product" by soaking felt with Top Foam, and then letting the felt dry. Amended Complaint at 5.

2

hands on deck" response. *See* <u>AWI MSJ</u>, Ex. D Part I at 24-25 (testimony from Joseph Rumberger, President of United Steelworkers Local 285 and AWI employee who worked with Mr. Cooper); <u>id.</u> at 32-33 (testimony from Harold Zorger, a former AWI employee). Accordingly, Mr. Cooper was pulled from his normal post and was reassigned to the Top Foam spill mitigation endeavor in Building 94's basement. <u>Id.</u> at 32-33; <u>Amended Complaint</u> at 5.[5] Despite the fact that the basement area was a confined space with nonexistent ventilation, AWI did not give Mr. Cooper or his co-workers proper protective gear, nor did it provide them with post-remediation decontamination. <u>AWI MSJ</u>, Ex. D Part I at 33 (testimony from Harold Zorger); <u>id</u> at 37 (testimony from David Clark, an AWI employee). These efforts "took days to accomplish," and were ultimately completed only through the assistance of an outside contractor. <u>Id.</u> at 33-34.

Mr. Cooper returned home after completing his role in the clean-up, at which point it was transparently clear to his wife that he was in great distress. According to Mrs. Cooper, her husband "walked in the door and it was like a barrage. He was screaming. He was swearing. He had tears running down his face, his eyes were watering and he was coughing. I don't even know how to explain the cough. I've never heard anybody cough like that... I asked him what was the matter." <u>Id.</u> at 27. Though it seems that Mr. Cooper's cough rendered him nearly incapable of speech, he was able to communicate to his wife that he and his coworkers had dealt with a major spill of some sort, and that he was not happy with having been required to assist with the cleaning. <u>Id.</u>; <u>Cooper Affidavit</u> at 2.[6] More than a week passed without any real improvement, leading Mr. Cooper to seek treatment from Dr. Gary Gehman, his personal physician, who prescribed a 10-day course of antibiotics in order to treat what Dr. Gehman apparently believed was some sort of sinus infection. <u>AWI MSJ</u>, Ex. D Part I at 27; <u>Cooper Affidavit</u> at 2. When this

---

[5] While Harold Zorger testified that he only saw Mr. Cooper assist with the clean-up in Building 94's basement on September 26, 2003, Mrs. Cooper claims that Mr. Cooper was also involved on September 25, 2003. *See* <u>AWI MSJ</u>, Ex. D Part I at 33-34; <u>Coopers' Response to AWI MSJ, Mrs. Cooper Affidavit</u> at 2-3 ("Cooper Affidavit").

[6] During her husband's workers' compensation case, Mrs. Cooper testified that she could not remember the exact date that this occurred, and could only narrow it down to the last week of September 2003. <u>AWI MSJ</u>, Ex. D Part I at 27; however, in an affidavit dated December 30, 2014, Mrs. Cooper claimed that her husband went to work on September 25, 2003 and returned later that day with an "an uncontrolled cough [which prevented him from speaking clearly], a splitting headache, 'burning sinuses.'" <u>Cooper Affidavit</u> at 2. This later recollection is at odds with Mr. Zorger's testimony, given that Mr. Zorger participated in the clean-up on both days, but only saw Mr. Cooper in Building 94's basement on September 26, 2003.

3

did not solve the problem, Dr. Gehman gave Mr. Cooper another round of antibiotics, though it is unclear whether this had any effect, positive or negative, on Mr. Cooper's physical well-being. AWI MSJ, Ex. D Part I at 27.

As the weeks and months rolled past, it became increasingly evident that the malady afflicting Mr. Cooper was far more serious than a simple infection. Mrs. Cooper, as well as their son and daughter, began to notice that, on occasion, Mr. Cooper would "bizarre[ly] [r]efer[] to one of the children as the wrong gender or something. It was really odd. It was almost like you weren't hearing the right thing." Id. Mr. Cooper's cognitive problems continued to worsen and, by November 2003, he was struggling with identifying individuals and "using proper names." As recalled by Mrs. Cooper, "[h]e would try to explain something and say well, they went there and they did that. He didn't know who it was; he didn't know where they going. And we just never heard this before. The kids commented on it. Even our friends commented on it too." Id. These issues subsequently bled over into Mr. Cooper's work life, and he began to have trouble keeping track of his schedule at AWI. Id. at 27-28. In response, Dr. Gehman gave Mr. Cooper a prescription for Paxil, an antidepressant, and scheduled him for an MRI; however, though Paxil seemed to improve Mr. Cooper's demeanor, it did nothing to help his memory, something remarked upon by his coworkers, who could not help but notice that Mr. Cooper was consistently confused and forgetful, even in situations where he was only undertaking routine tasks. *See, e.g.,* AWI MSJ, Ex. D Part I at 21-22 (testimony from Dennis Keller, a former AWI employee); id. at 34-35 (testimony from Harold Zorger); id. at 45 (testimony from Matthew Furman, a former AWI employee); id. at 47-48 (testimony from Gary Benedick, a former AWI employee). These cognitive lapses ultimately caused Mr. Cooper to have a series of unauthorized absences from work, prompting AWI to move towards disciplining him in late April 2004. *See* Coopers' Supplemental Brief in Support of Response to Defendant Alan J. Hay, M.D.'s Motion for Summary Judgment at 16 ("Supplemental Brief #1"); id. at Ex. 5 (Mr. Cooper's AWI attendance report covering April 23, 2003 through April 23, 2004); id. at Ex. 44 (letter, and attachments, from AWI's attorney to Workers' Compensation Judge Tina Rago).[7]

---

[7] The Coopers claim, in Supplemental Brief #1, that AWI tried to fire Mr. Cooper in January 2004; however, this averment clearly does not square with Mr. Cooper's attendance report, or the exhibits attached to the AWI attorney's letter to the Honorable Workers' Compensation Judge Tina Rago, which show that the first unauthorized absence for

4

Before AWI could discipline Mr. Cooper, however, Joseph Rumberger, his co-worker and the President of United Steelworkers Local 285, intervened and arranged to have him looked at by Dr. Alan Hay, M.D., of Lancaster General Hospital's Department of Occupational Medicine. Supplemental Brief #1 at 17;[8] id. at Ex. 7. According to Dr. Hay, Mr. Cooper's appointment was scheduled for at least four separate occasions, but Mr. Cooper repeatedly failed to appear or to notify Dr. Hay that he would not be in attendance. Id. at Ex. 7. Because of this, Matthew Fuhrman, Mr. Cooper's supervisor at AWI, had to accompany him during his May 13, 2004 visit to Dr. Hay's office. Id.; see also AWI MSJ, Ex. D Part I at 43-44 (noting Fuhrman's job title at AWI in 2003 and 2004). Dr. Hay evaluated Mr. Cooper on that date, noting that he "appear[ed] to have difficulty processing information and coming up with appropriate answers to specific questions," and opining that Mr. Cooper "definitely need[ed] a psychological assessment to try and identify the problem and [get] a diagnosis established." Supplemental Brief #1 at Ex. 7. Dr. Hay found that Mr. Cooper had "a general awareness that things are not right at work, that apparently when he is not doing something right that he has been trained to do[,] others get very excited[. Mr. Cooper] does not quite understand why they get all upset and excited[,] except that he is aware that this is not right and that he is the focus of something being wrong." Id. With regard to treatment, Dr. Hay "got permission verbally from [Mr. Cooper] to talk with Dr. Gehman... with the purpose of trying to have [Dr. Gehman] refer [Mr. Cooper] to a specialist for further evaluation and testing." Id. Dr. Hay shared the contents of this plan with Mr. Fuhrman, who was then tasked with bringing Mr. Cooper back to the Facility. Id.[9] Thereafter, at some

which Mr. Cooper was docked "points" did not occur until January 27, 2004, and state that discharge would not happen until after an employee had accrued more than 10 such points during a running 12-month period.

[8] The Coopers describe Dr. Hay as AWI's "panel physician." Supplemental Brief #1 at 17; however, it is unclear what the Coopers mean to suggest by using such a designation (ex. an agency or employee relationship, an independent contracting arrangement, etc.), nor did the Coopers provide any substantive evidence to flesh out Dr. Hay's putative title.

[9] Mrs. Cooper claims that she did not learn of her husband's visit to Dr. Hay, or about Dr. Hay's communications with Dr. Gehman until some point in 2009. Cooper Affidavit at 4-5; see also AWI MSJ, Ex. J Part I at 70-71 (deposition testimony from Mrs. Cooper); AWI MSJ, Ex. J Part II at 9-10 (same). This lack of knowledge seems, in part, to be due to Mr. Cooper's cognitive issues actively impeding his ability to communicate with his wife. See Dr. Hay's Motion for Summary Judgment, Ex. 1 at 8-9 ("Hay MSJ") ("[Dr. Hay's Attorney:] You were not aware before May 13 of 2004 that your husband was seen—had an appointment to see Dr. Hay, correct? [Mrs. Cooper:] No, I didn't know. Q: And you didn't know on that day that your husband saw a doctor? A: Not till [sic] I think he came home and said doctor something, but like I said, he was very hard to understand. I don't think I really had any idea what had happened, you know, he couldn't really describe it, no.").

5

point in late May, AWI placed Mr. Cooper on disability. AWI MSJ, Ex. D Part I at 19 (testimony from Robert Mattern, an AWI employee); id. at 28 (testimony from Mrs. Cooper). Subsequently, Dr. Hay spoke to Dr. Gehman, informing him of Dr. Hay's concerns about Mr. Cooper. Supplemental Brief #1 at Ex. 7. Dr. Gehman responded by referring Mr. Cooper to Dr. Ed Purzycki, a neuropsychologist; in contrast to his meeting with Dr. Hay, there is no doubt that Mrs. Cooper contemporaneously knew of, and accompanied, Mr. Cooper to his ensuing appointment with Dr. Purzycki. AWI MSJ, Ex. D Part I at 28 (testimony from Mrs. Cooper).[10]

On June 8, 2004, after being contacted by a disquieted Mr. Fuhrman, Dr. Hay again reached out to Dr. Gehman, in order to get an update regarding Mr. Cooper's treatment. Supplemental Brief #1 at Ex. 7. Dr. Gehman allegedly told Dr. Hay that he was still waiting to hear back from Dr. Purzycki, but that such a delay was not unexpected, given that the necessary neuropsychological tests generally took a decent amount of time to both conduct and interpret. Id.[11] Dr. Hay then called Mr. Cooper, who allegedly confirmed that he had indeed completed the aforementioned testing, and that he was frustrated with his current situation. Id. Finally, Dr. Hay got back in touch with Mr. Fuhrman, expressing his continued worry regarding Mr. Cooper's mental well-being, as well as his belief that, given Mr. Cooper's state, it would be prudent for Mr. Fuhrman or one of his associates to actively assist Mr. Cooper and his family, to ensure that all of the necessary medical leave paperwork was properly completed and filed. Id. Though Dr. Hay promised Mr. Fuhrman that he would be in touch once he had received additional information regarding Mr. Cooper's prognosis, id., the case record is devoid of any other substantive evidence regarding Dr. Hay's involvement with Mr. Cooper, and it appears that Dr. Hay did not take part in evaluating or treating Mr. Cooper after June 8, 2004.

What followed throughout the ensuing years was a series of additional referrals and examinations, as numerous medical professionals in both Lancaster and Philadelphia tried,

---

[10] It is unclear exactly when this appointment with Dr. Purzycki occurred; however, given Dr. Hay's notes, and the lack of evidence to the contrary, it is likely that it happened between May 13, 2004 (the date of Mr. Cooper's appointment with Dr. Hay) and June 8, 2004 (when Dr. Hay reached out to Dr. Gehman for an update). *See* Supplemental Brief #1 at Ex. 7 (note dated June 8, 2004 and authored by Dr. Hay).

[11] Inexplicably, neither the Coopers nor the Appellees saw fit to provide this Court with evidence or testimony from Dr. Gehman, i.e. the other party to this conversation.

without success, to pinpoint the precise etiology of (and appropriately treat) Mr. Cooper's progressively deteriorating mental condition. *See* Hay MSJ, Ex. 7 (letter from Dr. V. Mangeshkumar, M.D., to Dr. Gehman); AWI MSJ, Ex. D Part I at 28-29 (testimony from Mrs. Cooper); Supplemental Brief #1, Ex. 6 (Dr. Paul A. Kettl, M.D. stating that at least five doctors had "been unable to fully elucidate the cause of [Mr. Cooper's] dementia."); Cooper Affidavit at 6-7. These efforts were complicated by AWI, which (according to the Coopers) refused to release critical information regarding Mr. Cooper's chemical exposure history, purportedly stonewalling their lawyer's repeated requests for such documentation in 2005 and 2006,[12] and allegedly caused Mr. Cooper's employer-provided healthcare plan to be terminated without his consent on June 8, 2005. *See* Coopers' Supplemental Brief in Support of Response to Defendant AWI's Motion for Summary Judgment at 8-11, Ex. 11 ("Supplemental Brief #2"); Cooper Affidavit at 6-7.[13] Even so, Mrs. Cooper maintained the belief that her husband's affliction was a direct result of his time with AWI, stating that she had "always suspected some form of toxic exposure from his workplace[,] because of the sudden onset of his symptoms in the fall of 2003." Hay MSJ, Ex. 8 (letter from Mrs. Cooper to Dr. Gehman); *see also* id., Ex. 7 (letter from Dr. Mangeshkumar to Dr. Gehman).

Indeed, Mrs. Cooper had, by this point, recognized that her husband was irreparably injured and, accordingly, took steps to protect his long-term physical well-being, as well as their collective financial and legal interests. According to his wife, Mr. Cooper

> began to be suspicious of the neighbors… he kept talking about these people… I finally realized that he was hearing voices and… having [auditory] hallucinations[,] because he kept saying the people were coming in the house… He was aggressive with me on one occasion. He thought I was keeping something from him. He thought people were living in our house [and that they] were stealing the electricity… [D]uring the electricity episode he grabbed me by the throat and pushed me against the wall.

---

[12] The Coopers claim that AWI's attorney, Jeffrey Sidebottom, Esq., told their lawyer in December 2005 that "unless there's an active Worker's Compensation claim, [AWI will] not produce any [of Mr. Cooper's workplace chemical] exposure information." Supplemental Brief #2 at 9. Assuming that Mr. Sidebottom made this statement, AWI's refusal to release Mr. Cooper's exposure records prior to the Cooper's initiation of legal action flies directly in the face of Occupational Safety and Health Act's ("OSH Act" or "Act") plain language. *See* 29 C.F.R. § 1910.1020(e)-(f) (discussing employers' duty under the Act to provide employees with workplace chemical exposure and related medical records, and to do so in a timely fashion after such information has been requested by either an affected employee or his designated representative).

[13] According to Mrs. Cooper, this termination did not affect Mr. Cooper's receipt of disability or Medicare benefits. *See* AWI MSJ, Ex. D Part I at 30.

7

AWI MSJ, Ex. D Part I at 29. This prompted Mrs. Cooper to seek appointment as her husband's legal guardian, a request which was granted by the Honorable Jay J. Hoberg of the Court of Common Pleas, Lancaster County on June 7, 2006, who deemed Mr. Cooper to be "a totally incapacitated person." Supplemental Brief #1 at 11, Ex. 15. Mrs. Cooper then had her husband admitted to Magnolias of Lancaster, "a secure, adult assisted-living residence," where his decline continued, unabated, despite receiving full-time care from medical professionals. *See* id.; AWI MSJ, Ex. D Part I at 29-30.

Mrs. Cooper coupled these movements with legal action against AWI on behalf of her husband. On November 17, 2007, Mr. Cooper was examined by Dr. Stephen Gold, M.D.,[14] who diagnosed Mr. Cooper as suffering from work-related "encephalopathy with subsequent dementia." Supplemental Brief #1, Ex. 16. Having now been provided with a medical opinion linking Mr. Cooper's illness to his time at AWI, Mrs. Cooper responded by filing a worker's compensation claim petition ("Petition") on December 17, 2007, asserting therein that her husband had been harmed during the course of his employment through "toxic overexposure" that had caused "encephalopathy with dementia." AWI MSJ, Ex. A.[15]

As the claim process moved forward before the Honorable Workers' Compensation Judge Tina Rago, the Coopers reiterated their request to AWI, on multiple occasions, that it release historical data regarding Mr. Cooper's exposure to chemicals in the workplace, additionally asking for numerous material safety data sheets ("MSDS").[16] In addition, they asked for detailed documentation regarding Mr. Cooper's work duties, as well as AWI's Facility safety

---

[14] Dr. Gold worked for Prudential Financial, who was Mr. Cooper's disability insurance carrier. *See* Supplemental Brief #1 at 11, Ex. 16.

[15] This Petition was amended on February 13, 2008, revising the initial cause-and-effect statement to claim that Mr. Cooper's "chronic exposure to hydrocarbon distillates and halogenated hydrocarbons [had resulted in] irreversible encephalopathy." AWI MSJ, Ex. B. On September 20, 2008, the Petition was modified a second time, to reflect that Mr. Cooper had recently been diagnosed with work-related Parkinson's Disease. Id., Ex. C.

[16] Now called a Safety Data Sheet, an MSDS must be promulgated by a chemical's "manufacturer, distributor, or importer... for each hazardous chemical to downstream users [in order] to communicate information on these hazards... [and] includes information such as the properties of each chemical; the physical, health, and environmental health hazards; protective measures; and safety precautions for handling, storing, and transporting the chemical." OSHA Brief—Hazard Communication Standard: Safety Data Sheets, Occupational Safety & Health Administration, February 2012, https://www.osha.gov/Publications/OSHA3514.html.

8

and maintenance procedures. *See* Supplemental Brief #1, Exs. 20-22. Based off of the substantive evidence provided to this Court, it appears that the Coopers did receive some, or most, of the sought-after information. *See* id., Exs. 23-30, 32 (communications between Coopers' counsel and AWI's counsel); however, on November 13, 2008, AWI notified the Coopers that "some of the previous [chemical] exposure records had been inadvertently lost or destroyed," something which allegedly had not been discovered prior to the Coopers' discovery requests. Id., Ex. 32; *see also* id., Ex. 31 (letter from Brent Davis to Jeffrey Sidebottom, Esq., AWI's lawyer). AWI attempted to remedy this error by reconstructing these records to some degree, sending the fruits of these efforts to the Coopers in lieu of the originals, and continuing to search for additional, relevant information. Id., Ex. 32, 34-37.[17]

This claim of irreversible document destruction was later thrown into doubt in late January 2011 after Paul Heisey, an AWI employee, discovered password-protected chemical exposure records pertaining to Mr. Cooper on a networked computer hard drive at AWI.[18] Supplemental Brief #1, Ex. 39 at 42-45. The parties disputed the import of these newly-unearthed records, as the Coopers claimed that their existence incontrovertibly revealed that AWI had been withholding crucial information, while AWI claimed that they were simply duplicative of other material that had already been provided to the Coopers. Id. at 48-51, 54-55. Unfortunately, this debate was never ultimately resolved, as Judge Rago ended discovery without requiring AWI to unlock these files, meaning that the precise nature of their contents remained unexposed. Supplemental Brief #1 at 21.

Despite these issues, and the very real possibility that AWI had not been entirely forthcoming or transparent, this did not stop Mrs. Cooper from learning of Dr. Hay's post-spill evaluation of Mr. Cooper. At an unspecified point during 2009, Mrs. Cooper discovered that Dr. Hay had taken part in treating her husband at the behest of his employer and, accordingly, obtained Dr. Hay's 2004 examination and follow-up notes. *See* Cooper Affidavit at 5. Mrs.

---

[17] The parties failed to provide this Court with any of the reconstituted records. As such, this Court is unable to opine as to the records' substance or sufficiency.

[18] Mr. Heisey stated that he discovered the files on "the Tuesday prior to [his] retirement." Supplemental Brief #1, Ex. 39 at 44-45. As Mr. Heisey retired on February 1, 2008, the previous Tuesday would be January 29, 2008. Id.

Cooper found these notes to be of little substantive value, as they "did not mention a diagnosis oi cause of [her] husband's mental disability or any mention of brain damage or [her] husband's toxic exposures at work," id., and ultimately came to believe that Dr. Hay had, in concert with AWI, purposefully attempted to conceal the source and nature of Mr. Cooper's malady. *See* AWI MSJ, Ex. J Part II at 8-19 (testimony from Mrs. Cooper regarding suspicions she had about the conduct of Dr. Hay and AWI).

Nor were the Coopers prevented from finally understanding, to some degree of precision, Mr. Cooper's illness. In February 2008, Dr. Ruben Gur, Ph.D.[19] and his team at the University of Pennsylvania determined, via differential diagnosis, that Mr. Cooper suffered from "trichloroethylene[20]-induced brain damage." Reply Memorandum of Law in Response to the Supplemental Brief in Support of Plaintiffs' Response to Defendant Alan J. Hay, M.D.'s Motion for Summary Judgment, and in Further Support of the Motion for Summary Judgment of Defendant Alan J. Hay, M.D., Ex. D Part I at 4 ("Hay MSJ Supplemental Memo"). Dr. Gur stated that his "team diagnosed [this] damage using neuropsychological testing, neuropsychiatric testing, functional neuroimaging and anatomical (structural) neuroimaging," opining that the "particularized specialties [and] perspectives that [his] team applied were necessary to determine" the source of Mr. Cooper's affliction. Id. Dr. Gur's assessment was echoed on September 4, 2008 by Dr. Jack Thrasher, Ph.D.,[21] who determined that Mr. Cooper had, over the course of his career with AWI, been exposed on a regular basis to numerous "halogenated

---

[19] Dr. Gur is "the Director of Neuropsychology, the Brain Behavior Laboratory, and the Center for Neuroimaging in Psychiatry at the University of Pennsylvania Perelman School of Medicine... [and has] patient, faculty, teaching and professional responsibilities in the University of Pennsylvania Perelman School of Medicine and at the Hospital at the University of Pennsylvania as well as the Philadelphia Veterans Administration Medical Center." Reply Memorandum of Law in Response to the Supplemental Brief in Support of Plaintiffs' Response to Defendant Alan J. Hay, M.D.'s Motion for Summary Judgment, and in Further Support of the Motion for Summary Judgment of Defendant Alan J. Hay, M.D., Ex. D Part I at 3-4 (affidavit signed by Dr. Gur).

[20] According to the Centers for Disease Control and Prevention, long-term or repeated exposure to trichloroethylene "may have effects on the central nervous system, resulting in loss of memory." International Chemical Safety Cards (ICSC): Trichloroethylene, July 1, 2014, Centers for Disease Control and Prevention, *available at* http://www.cdc.gov/niosh/ipcsneng/neng0081.html.

[21] Dr. Thrasher is a toxicologist and immunotoxicologist who produced a toxicology report regarding Mr. Cooper. *See* Hay MSJ Supplemental Memo, Ex. D Part II.

10

hydrocarbons and hydrocarbon distillates... known neural toxins which cause brain damage,"[22] and that Mr. Cooper's post-spill mental deterioration was proof that he had been stricken by "a severe toxic encephalopathy." Hay MSJ Supplemental Memo, Ex. D Part II at 12-14. Due to the severity of Mr. Cooper's symptoms, Dr. Thrasher offered a stark prognosis, stating that Mr. Cooper's "global deterioration in intellectual and memory functions (dementia)... may be irreversible, or [is] at best, poorly reversible." Id. at 13-14. Thereafter, on October 29, 2010, Dr. Frederick W. Fochtman, Ph.D.,[23] issued a report indicating his agreement with Dr. Gur and Dr. Thrasher, declaring that Mr. Cooper's long-term and acute, spill-related exposure to halogenated hydrocarbons, hydrocarbon distillates, and solvents had caused demyelination,[24] as well as cell death, within Mr. Cooper's brain, resulting in severe neurological damage and Parkinsonian symptoms. AWI Reply Brief in Support of Motion for Summary Judgment, Ex. A. at 3-4.[25] This knowledge undoubtedly provided cold comfort to the Coopers, given that, had AWI released the relevant exposure information within a few years of the Top Foam spill, Mr. Cooper's doctors would have possibly been able to properly treat his "movement disorder and... [keep] him at a functioning level for longer," even if the "underlying pathology and damage may not have changed significantly" as a result. See AWI MSJ, Ex. D Part II at 39-41 (testimony from Dr. Timothy Martin, D.O.).

---

[22] Dr. Thrasher opined that, at the very least, Mr. Cooper had been exposed at AWI to the following halogenated hydrocarbons and hydrocarbon distillates: Solvesso-Aromatic 150, Vinyl Chloride, Chlorothene, Trichloroethylene, 1, 1, 1 Trichloroethane Mixture, Tetrachloroethylene, Methylene Chloride, Toluene, Xylene and Trimethylbenzene. Id. at 12-13.

[23] Dr. Fochtman is an associate professor of pharmacology and toxicology at Duquesne University, and is the director of Duquesne's masters-level program in forensic science and law. See Supplemental Brief #1, Ex. 51.

[24] "Demyelination kills brain cells by dissolving the myelin insulation on the exterior of brain cells. Brain cells act as 'wires' which conduct electrical signals to nerves, muscles and organs. Myelin is the fatty insulation on the 'wire.' Once the myelin is dissolved, the 'wire' shorts-out and dies." AWI Reply Brief in Support of Motion for Summary Judgment, Ex. A. at 3.

[25] In addition, at least four other doctors either examined Mr. Cooper or reviewed his medical records between June 2008 and November 2010, with all four coming to essentially the same conclusion as Drs. Fochtman, Gold, Gur, and Thrasher, i.e. that Mr. Cooper had been exposed to hazardous solvents at AWI, which had caused him to be afflicted by toxic encephalopathy and a Parkinson's Disease-type movement disorder, and that his prognosis was poor. See Hay MSJ, Ex. 10 (June 11, 2008 letter from Dr. Sooja Cho, M.D., to Dr. Gold); id., Ex. 12 (September 4, 2008 letter from Dr. Andrew B. Newberg, M.D., to Judge Rago; id., Ex. 16 (November 1, 2010 letter from Dr. Rajnish P. Chaudhry, M.D., to the Coopers' attorney); id., Ex. 17 (November 2, 2010 letter from Dr. Timothy C. Martin, D.O., to the Coopers' attorney).

11

Even if these belated diagnoses could not effect a reversal of Mr. Cooper's physical deterioration, they did allow him to successfully prosecute his workers' compensation claim. Judge Rago held thirteen hearings over the course of nearly four years, in the process reviewing a copious amount of documentation, physically visiting the Facility and the spill site itself, hearing testimony from Mr. Cooper's family members, his coworkers, and other former or current AWI employees, and weighing the learned opinions of numerous medical experts, including some from AWI who disputed the notion that Mr. Cooper's illness had been caused by exposure to toxic chemicals at the Facility. *See* AWI MSJ, Ex. D Parts I and II (Judge Rago's written decision regarding Mr. Cooper's workers' compensation claim). Ultimately, after weighing all of the evidence, Judge Rago ruled in favor of Mr. Cooper on June 27, 2012, finding that he suffered from toxic encephalopathy, which had been caused by a combination of chronic solvent and chemical exposure while working at AWI, and acute exposure to Top Foam during the aforementioned September 2003 spill. Id., Ex. D. Part II at 49-50. Accordingly, Judge Rago awarded Mr. Cooper compensation benefits, calculated from April 23, 2004 onwards (i.e. Mr. Cooper's last work day at AWI) and minus a "40% credit [to AWI] for any short or long term disability benefits received by [Mr. Cooper]," along with statutory interest, attorney's fees, and litigation costs. Id. at 50-51. In addition, Judge Rago declared that AWI was "responsible for the payment of any and all medical expenses incurred for the treatment of [Mr. Cooper] which was reasonable, necessary and related to [his] employment injury." Id. at 50.

Nearly fourteen months later, on August 22, 2013, the Coopers filed suit in the Court of Common Pleas, Philadelphia County, naming AWI as the sole defendant, subsequently adding Dr. Hay as a defendant when they docketed an amended complaint on October 9, 2013. The Coopers claimed that AWI and Dr. Hay had fraudulently concealed, both separately and collectively, the full extent of their knowledge regarding Mr. Cooper's job-related exposure to chemicals, in order "to keep Mr. Cooper and his family from learning critical information—information AWI has long had... and still has in its possession—that would have made an important positive difference in Mr. Cooper's diagnosis, treatment and prognosis." Amended Complaint at 1.[26] They also argued that this alleged lack of candor had prevented Mr. Cooper's

_____

[26] Additionally, the Coopers theorized that AWI and Dr. Hay had intentionally "deleted or omitted" information from Dr. Hay's 2004 reports, and that "the results of Dr. Hay's interactions with [Mr. Cooper had been] shared only

12

"[trichloroethylene]-induced toxic solvent encephalopathy and [trichloroethylene]-induced Parkinson's disease, [and] other systemic injuries" from being diagnosed in a timely manner or treated in a proper fashion. Id. at 18-19. Accordingly, the Coopers jointly lodged counts of fraud, civil conspiracy, and "recklessness" against the Appellees, with Mrs. Cooper claiming, in addition, that AWI and Dr. Hay[27] had, by virtue of their actions, both intentionally and negligently inflicted emotional distress upon her. Id. at 20-24. In response, both AWI and Dr. Hay filed preliminary objections on October 28 and 29, 2013, respectively, each of which were overruled, in full, by the Honorable Mark Bernstein on November 29, 2013. Dr. Hay then filed an Answer with New Matter on December 30, 2013, while AWI docketed its Answer with New Matter on January 8, 2014.[28]

The parties subsequently conducted discovery over the following months and engaged in a flurry of motion practice, with the Appellees seeking to transfer the case to Lancaster County, and Mrs. Cooper requesting that this matter be consolidated with her related wrongful death/survival suit,[29] see Hay Petition to Transfer Pursuant to Pa. R.C.P. 1006(d)(1) at 1-9; AWI's Petition to Transfer Pursuant to Pa. R.C.P. 1006(d)(1) at 2-4; Motion to Consolidate, 10/25/14 at 2-4,[30] culminating on December 1, 2014 with the filing, by AWI and Dr. Hay, of two separate motions for summary judgment. Therein, each Appellee asserted that the Coopers' suit

---

with… AWI for the purpose of aiding AWI in avoiding liability for [Mr. Cooper's] healthcare costs and for the purpose of justifying (falsely) [its] terminating [sic] of [his] healthcare coverage." Amended Complaint at 11, 13. The Coopers also vaguely averred that Mr. Cooper had had "other interactions with Dr. Hay… [but] that those records [pertaining to such interactions] may have been destroyed." Id. at 13.

[27] The Coopers specifically stated that they were "not asserting a professional negligence action against Dr. Hay," that "Dr. Hay and [Mr.] Cooper did not have a physician-patient relationship," and that "[a]t no time did [Mr.] Cooper see Dr. Hay for medical treatment." Amended Complaint at 2 (emphasis in original).

[28] The Coopers filed replies to Appellees' New Matters on January 13 and 15, 2014.

[29] Tragically, Mr. Cooper passed away on February 5, 2014. See Coopers' Memorandum of Law in Support of Response to AWI's Motion for Summary Judgment at 2-3; see also Suggestion of Death, 7/1/14 at 1. This prompted Mrs. Cooper and the Coopers' children to file a wrongful death and survival suit on October 22, 2014 against AWI, Dr. Hay, and Lancaster General Occupational Medicine in the Court of Common Pleas, Philadelphia County. See Cooper et al. v. Armstrong World Industries, Inc., et al., October Term 2014, No. 2596.

[30] Judge Bernstein granted this Motion to Consolidate via an order docketed on December 2, 2014. See Bernstein Order, 11/26/14 at 1.

was barred by Pennsylvania's Workers' Compensation Act ("WCA"),[31] as well as the applicable statute of limitations, and that this Court should thus enter judgment in the Appellees' respective favors. *See* Memorandum of Law in Support of AWI MSJ at 4-13; Memorandum of Law in Support of Hay MSJ at 14-20, 31-32.[32] This prompted the Coopers to file a number of jumbled and somewhat-duplicative responses on January 2 and 3, 2015, in which they made multi-pronged arguments against the Appellees' requests for summary judgment. *See* Memorandum of Law in Support of Response to AWI MSJ at 1-16; Memorandum of Law in Support of Response to Hay MSJ at 1-15.[33]

On January 21, 2015, this Court granted both of these motions in part,[34] and gave the Coopers five days to clarify their arguments by:

---

[31] *See* 77 P.S. § 481(a) ("The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes [sic], his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108.").

[32] AWI also contended that there was no genuine issue of material fact regarding Mrs. Cooper's negligent and intentional infliction of emotional distress claims, and that judgment should be granted in its favor on those counts. Memorandum of Law in Support of AWI MSJ at 4. Dr. Hay made the same argument regarding all of the Amended Complaint's specific claims and, in addition, posited that the Coopers' allegations against him were really rooted in medical malpractice, and that their failure to offer an expert report regarding the situational standard of care should result in the dismissal of the Coopers' claims against him. Memorandum of Law in Support of Hay MSJ at 20-21.

[33] The Coopers claimed that summary judgment should not be granted as to AWI because, in essence: 1. AWI's Motion for Summary Judgment was "untimely," since the pleadings weren't closed in the lead consolidated case (Cooper et al. v. Armstrong World Industries, Inc., et al., October Term 2014, No. 2596); 2. The law of the case doctrine precluded a finding that the suit was barred by the Workers' Compensation Act; 3. The duties imposed upon AWI by the federal Occupational Safety and Health Administration's ("OSHA") Employee Exposure and Medical Records ("EEMR") regulations, 29 C.F.R. § 1910.1020, preempted Pennsylvania's two-year statute of limitations pertaining to civil fraud suits; 4. The Cooper Affidavit created a genuine issue of material about when Mrs. Cooper learned of Appellees' "fraud"; 5. Affidavits from the Coopers' medical experts created a genuine issue of material fact about AWI's OSHA-based duties; The Cooper Affidavit created a genuine issue of material fact regarding Mrs. Cooper's alleged reliance on AWI's willingness to give her Mr. Cooper's complete workplace chemical exposure records; 7. Mrs. Cooper's deposition testimony about watching her husband suffer from September 2003 onwards created a genuine issue of material fact regarding her negligent infliction of emotional distress claim; and 8. The duties imposed upon AWI by OSHA's EEMR regulations preempt the Workers' Compensation Act. The Coopers also made virtually the same challenges against Dr. Hay's Motion for Summary Judgment, with the exception of omitting their "law of the case" argument, and maintaining that the Cooper Affidavit created a genuine issue of material fact regarding Mrs. Cooper's intentional infliction of emotional distress claim against Dr. Hay.

[34] This Court granted summary judgment for both AWI and Dr. Hay regarding Mrs. Cooper's emotional distress claims, and for Dr. Hay only regarding the Coopers' "recklessness" claim. *See* Ceisler Order, 1/21/15 (AWI) at 1; Ceisler Order, 1/21/15 (Hay) at 1.

14

fil[ing] of record a supplemental brief covering or providing the following: a. A coherent, detailed timeline of [their] efforts to obtain information from [AWI and Dr. Hay] pertaining to [Mr.] Cooper's exposure to [trichloroethylene], backed by cites to the case record and specific documentation; b. The specific provisions of 29 C.F.R. § 1910.1020 that create a private cause of action and preempt the relevant statute of limitations, coupled with case law specifically backing this legal argument; and, c. A coherent explanation of how [their] remaining claims are not time-barred, when evidence in the case record establishes that [the Coopers] were aware of [Mr. Cooper's] exposure to [trichloroethylene] no later than February 2008.

Ceisler Order, 1/21/15 (AWI) at 1; Ceisler Order, 1/21/15 (Hay) at 1. The Coopers reacted by submitting supplemental briefs on January 25 and 27, 2015, in which they provided the requested timeline, and asserted that summary judgment was not warranted under the circumstances because, allegedly: 1. Mrs. Cooper did not get actual notice of Dr. Hay's or AWI's fraudulent behavior until late 2011; 2. While 29 C.F.R. § 1910.1020[35] did not create a private cause of action, it did impose a duty upon both Appellees to preserve, maintain, and readily offer access[36]

---

[35] Administrative agency regulations, such as this one, have the force and effect of law by virtue of their publication in the federal government's Code of Federal Regulations. *See* Beemus v. Interstate Nat'l. Dealer Svcs., Inc., 823 A.2d 979, 980 (Pa. Super. Ct. 2003). This specific regulation was promulgated by the federal Occupational Safety and Health Administration ("OSHA") pursuant to its powers under the OSH Act.

[36] *See* 29 C.F.R. § 1910.1020(e)(1)-(2)
("Access to records--
(1) General.
    (i) Whenever an employee or designated representative requests access to a record, the employer shall assure that access is provided in a reasonable time, place, and manner. If the employer cannot reasonably provide access to the record within fifteen (15) working days, the employer shall within the fifteen (15) working days apprise the employee or designated representative requesting the record of the reason for the delay and the earliest date when the record can be made available.
    (ii) The employer may require of the requester only such information as should be readily known to the requester and which may be necessary to locate or identify the records being requested (e.g. dates and locations where the employee worked during the time period in question).
    (iii) Whenever an employee or designated representative requests a copy of a record, the employer shall assure that either:
        (A) A copy of the record is provided without cost to the employee or representative,
        (B) The necessary mechanical copying facilities (e.g., photocopying) are made available without cost to the employee or representative for copying the record, or
        (C) The record is loaned to the employee or representative for a reasonable time to enable a copy to be made...

(2) Employee and designated representative access--
    (i) Employee exposure records.
        (A) Except as limited by paragraph (f) of this section [pertaining to trade secrets], each employer shall, upon request, assure the access to each employee and designated representative to employee exposure records relevant to the employee. For the purpose of this section, an exposure record relevant to the employee consists of:
            (1) A record which measures or monitors the amount of a toxic substance or harmful physical agent to which the employee is or has been exposed;

15

to Mr. Cooper's work-related medical records for at least 30 years beyond his last day of employment at AWI.[37] Accordingly, this regulation preempts Pennsylvania's two-year statute of limitations for civil fraud suits; and 3. Even assuming that such preemption did not occur, this statute of limitations was tolled until Mrs. Cooper knew the precise nature of Mr. Cooper's affliction, which occurred only after he was autopsied at some unspecified point in 2014. *See* Supplemental Brief #1 at 32-42; Supplemental Brief #2 at 22-32. This prompted additional replies from both AWI and Dr. Hay, in which they each emphatically stated that the Coopers had failed to put forth any meritorious arguments in these supplemental briefs, and reiterated their belief that judgment should be granted in their respective favors. *See* AWI Reply Brief in Support of Motion for Summary Judgment at 1-4; Hay Reply Memorandum of Law in Response to Supplemental Brief #1 at 1-10.

Ultimately, after deliberating over the parties' respective arguments, the case record, and the relevant law, this Court determined that the Coopers' suit was time-barred, granting summary judgment in favor of both AWI and Dr. Hay regarding the Coopers' remaining claims, doing so via two orders docketed on February 2, 2015. *See* Ceisler Order, 1/30/15 (AWI) at 1; Ceisler Order, 1/30/15 (Hay) at 1. In response, the Coopers appealed these decisions to the Superior Court of Pennsylvania on February 10, 2015.[38] That same day, this Court ordered the Coopers to provide a

---

(2) In the absence of such directly relevant records, such records of other employees with past or present job duties or working conditions related to or similar to those of the employee to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents to which the employee is or has been subjected, and
(3) Exposure records to the extent necessary to reasonably indicate the amount and nature of the toxic substances or harmful physical agents at workplaces or under working conditions to which the employee is being assigned or transferred.
(B) Requests by designated representatives for unconsented access to employee exposure records shall be in writing and shall specify with reasonable particularity:
(1) The records requested to be disclosed; and
(2) The occupational health need for gaining access to these records.").

[37] With some exceptions, employers must "assure the preservation and retention of... [e]mployee medical records... [e]mployee exposure records... [and] analyses [done through the use of] exposure or medical records... for at least thirty (30) years." Id. at 1910.1020(d)(1)(i)-(iii).

[38] For reasons unknown, the Coopers filed four separate appeals in this case on February 10, 2015, some of which are duplicative. None of these appeals, however, challenged this Court's January 21, 2015 orders, the substance of which is discussed in Note 34, *supra*. Thus, the Coopers' appeals only challenge this Court's decision to grant

Statement of Errors pursuant to Pa. R.A.P. 1925(b). Ceisler Order, 2/10/15 at 1. The Coopers response was received by this Court on March 2, 2015, and is attached to this opinion as Appendix A.

## II.    DISCUSSION

This Court respectfully requests that the instant appeals be denied for the following reasons:

1. The OSH Act does not preempt state law-based statute of limitations governing fraud (and related conspiracy) claims;

2. Under Pennsylvania law, the Coopers were required to file suit within two years of being capable, through the exercise of reasonable diligence, of knowing that they potentially had a cause (or causes) of action against the Appellees;

3. Viewing the record in the light most favorable to the Coopers, this Court determined that there was no genuine issue of material fact that November 2, 2010 was the last possible date upon which the Coopers could be deemed to have enough information, when coupled with such diligence, to ascertain that they had grounds for filing a fraud and conspiracy-based suit against Appellees, meaning that the statute of limitations began to run no later than that date;

4. As the Coopers failed to file such an action until August 22, 2013, or roughly ten months after the statutory window had closed, their suit was thus time-barred.

Under Pennsylvania law, a trial court may grant a party's motion for summary judgment when "there is no genuine issue of material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa. R.C.P. 1035.2(1). In addition, such a motion can be granted in situations where "an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to a cause of action or defense in which a jury trial would require the issues be submitted to a jury." Id. at 1035.2(2). That having been said, the court's sole function when addressing a motion for summary judgment is to determine whether there is a genuine issue of material fact to be tried,

summary judgment in favor of both Defendants regarding the Coopers' fraud and civil conspiracy counts, and for AWI as to the Coopers' independent claim of "recklessness."

17

rather than to decide issues of fact. Fine v. Checcio, 870 A.2d 850, 862 (Pa. 2005). To that end, a trial court must resolve all doubts against the movant, examining the case record in the light most favorable to the nonmoving party, and "may grant summary judgment only where the right to such a judgment is clear and free from doubt." Id. at 857 (citation omitted). Accordingly, this Court evaluated Appellees' motions for summary judgment through the lens of this stringent standard.

Normally, the WCA would have precluded the Coopers from filing suit against AWI and its agents, since it is "the sole and exclusive remedy for an employee who seeks to recover for an injury sustained during the course of his... employment." Snyder v. Pocono Med. Ctr., 656 A.2d 534, 536 (Pa. Super. Ct. 1995) (*citing* Wagner v. National Indemnity Co., 422 A.2d 1061, 1064 (Pa. 1980)). The WCA represents a compromise of sorts, which

> limits an employer's tort exposure and grants an employee a statutory remedy for all work related injuries. In exchange for the right to compensation without the burden of establishing fault, employees gave up their right to sue the employer in tort for injuries received in the course of employment. An employer must assume liability under the Act regardless of fault in exchange for insulation from a potentially larger verdict in a common law action. Where an employee's injury is compensable under the Act, the compensation provided by the statute is the employee's exclusive remedy.

Soto v. Nabisco, Inc., 32 A.3d 787, 791 (Pa. Super. Ct. 2011) (*quoting* Snyder, 656 A.2d at 536-37); *see* 77 P.S. § 481(a).[39]

However, the Pennsylvania Supreme Court has seen fit to craft an extremely narrow exception to this rule, which allows an employee to file a common law-based suit against his employer in situations where he can show that the employer has made some sort of fraudulent misrepresentation, which then leads to the aggravation of the employee's pre-existing condition. Martin v. Lancaster Battery Co., 606 A.2d 444, 448 (Pa. 1992).[40] The "misrepresentation can

---

[39] The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes [sic], his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in [77 P.S. § 411(1) and (2)] or occupational disease as defined [77 P.S. § 27.1].

[40] *See* Martin, 606 A.2d at 447-48 ("Clearly, when the Legislature enacted the [WCA] in this Commonwealth, it could not have intended to insulate employers from liability for [such] flagrant misconduct... by limiting liability to the coverage provided by the [WCA].").

18

take many forms[, as] fraud consists [of] anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, by speech or silence, word or mouth, of look or gesture. It is any artifice by which a person is deceived to his disadvantage." Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451, 454 (Pa. 1971) (*quoting* In re Reichert's Estate, 51 A.2d 615, 617 (Pa. 1947)). In order

> to prove fraud, a plaintiff must demonstrate by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud.

Hart v. Arnold, 884 A.2d 316, 339 (Pa. Super Ct. 2005) (*quoting* Blumenstock v. Gibson, 811 A.2d 1029, 1034 (Pa. Super. Ct. 2002)). Thus, a great onus is placed upon an employee who attempts to thread this needle, and our courts have not hesitated to dismiss a common law suit, or enter judgment for an employer, where an employee has failed to satisfy his high evidentiary burden. *See, e.g.,* Kostryckyj v. Pentron Lab. Technologies, LLC, 52 A.3d 333, 340 (Pa. Super Ct. 2012) (affirming trial court's grant of summary judgment in favor of employer because Appellants "failed to present any evidence that [the employer] intended to mislead [the employee] or deliberately misrepresented the dangers of beryllium to induce [the employee] to continue working for [the employer]."); id. at 339 (listing string of cases which were dismissed at various stages of litigation for failing to satisfy the Martin standard).

When seeking to avail himself of this exception, and regardless of whether he *actually* presents a viable claim that falls within the exception's ambit, an employee must still comply with the relevant statute of limitations by filing suit in a timely fashion. Generally speaking, such statutes should be strictly applied, and "are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience," Kingston Coal Co. v. Felton Min. Co., 690 A.2d 284, 288 (Pa. Super. Ct. 1997) (citations omitted). Accordingly, a statute of limitations "begins to run as soon as the right to institute and maintain a suit arises; [a person's] lack of knowledge, mistake or misunderstanding do not toll the[ir] running… even though [he] may not discover his injury until

19

it is too late to take advantage of the appropriate remedy." <u>Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.</u>, 468 A.2d 468, 471 (Pa. 1983). This reflects the notion that "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based[,] and to institute suit within the prescribed statutory period." <u>Id.</u>

Nonetheless, a court *may*, in certain instances and for equitable purposes, decline to enforce a statute of limitations with such rigidity, taking into account a party's inability to discern, in a timely manner, the source or existence of the harm visited upon him, or the effect of obstruction on an individual's efforts to ascertain the root of his injury. In the former scenario, the discovery rule "exclude[s] from the running of the statute of limitations that period of time during which a party[,] who has not suffered an immediately ascertainable injury[,] is reasonably unaware he has been injured, so that he has essentially the same rights as those who have suffered such an injury." <u>Fine</u>, 870 A.2d at 858. In the latter, the doctrine of fraudulent concealment tolls the statute of limitations "if through fraud or concealment, [a defendant has] cause[d] the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts," estopping the defendant from asserting such a defense relating to the time period during which the fraud occurred. <u>Id.</u> at 860. Though this doctrine "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception... [a party must still] prov[e that] fraudulent concealment [has occurred] by clear, precise, and convincing evidence." <u>Id.</u> "Moreover, in order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the [injured party] justifiably relied." <u>Kingston</u>, 690 A.2d at 291 (*citing* <u>Krevitz v. City of Philadelphia</u>, 648 A.2d 353, 357 (Pa. Cmwlth. Ct. 1994)).

Despite these differences, neither the discovery rule nor the fraudulent concealment doctrine can be invoked by a party who has not exercised reasonable diligence[41] in learning, or

---

[41] Reasonable diligence is viewed in an objective manner, and "a party's actions are evaluated to determine whether he exhibited 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others.'" <u>Fine</u>, 870 at 858 (*quoting* <u>Crouse v. Cyclops Industries</u>, 745 A.2d 606, 611 (Pa. 2000)).

20

seeking to learn, "that he is injured and by what cause." Fine, 870 A.2d at 858, 861; *see* Wilson v. El-Daief, 964 A.2d 354, 363 (Pa. 2009) ("The suggestion that a plaintiff need not know that a defendant's conduct is injurious is true, to the extent that the plaintiff has failed to exercise diligence in determining injury and cause by another, but has limited relevance in scenarios in which the plaintiff has exercised diligence but remains unaware of either of these factors."); Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co., 31 A. 484, 485 (Pa. 1895) ("The question in any given case is not, what did the plaintiff know of the injury done him[,] but[] what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?");[42] Baselice v. Franciscan Friars Assumption BVM Province, Inc., 879 A.2d 270, 276 (Pa. Super. Ct. 2005) (*quoting* Haggart v. Cho, 703 A.2d 522, 526 (Pa. Super. Ct. 1997)) ("The statute begins to run in such instances when the injured party 'possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress.'"). Indeed, the statute of limitations can be deemed to have run, even in instances where a party does "not know the precise... cause of [their] injury... [does] not apprehend that [the party who injured them] was negligent... and [does] not understand [that they] have a cause of action." Wilson, 964 A.2d at 364 n. 10 (citations omitted).

Turning to the matter at hand, the Coopers challenge this Court's February 2, 2015 orders, which served to grant summary judgment in favor of both Appellees regarding the Coopers' fraud and civil conspiracy claims, and for AWI as to the Coopers' claim of "recklessness." *See* Ceisler Order 1/21/15 (AWI), at 1; Ceisler Order 1/21/15 (Hay), at 1; Ceisler Order 1/30/15 (AWI), at 1; Ceisler Order 1/30/15 (Hay), at 1. Under Pennsylvania law, each of these claims is governed by the same statute of limitations, which gives a party two years from the date of injury to initiate a suit based upon such arguments. *See* 42 Pa. C.S. §§ 5524(2), (7).[43]

---

[42] It is normally the jury's role to determine whether a party has exercised reasonable diligence under the circumstances. *See* Fine, 870 A.2d at 858, 861 (Pa. 2005). Thus, it is "[o]nly where the facts are so clear that reasonable minds could not differ... [that] a court [may] determine as a matter of law[,] at the summary judgment stage, the point at which a party should have been reasonably aware of his or her injury and its cause[,] and thereby fix the commencement date of the limitations period." Gleason v. Borough of Moosic, 15 A.3d 479, 485 (Pa. 2011).

[43] "It is well-settled that the statute of limitations for conspiracy is the same as that for the underlying action which forms the basis of the conspiracy." Kingston, 690 A.2d at 287 (*citing* Ammlung v. City of Chester, 494 F.2d 811, 814–815 (3d. Cir.1974)). In addition, "[r]ecklessness, or willfulness, or wantonness refers to a degree of care [Dean] Prosser describes as 'aggravated negligence.' Nevertheless, [these terms] apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is to be

21

The Coopers argue that 29 C.F.R. § 1910.1020 overrides this time limit, due to the supremacy of federal law, and extends the deadline for filing suit through May 2034. *See, e.g.,* Supplemental Brief #1 at 39-40; Statement of Errors at 2; however, this contention is completely without merit for several reasons.[44] First, the OSH Act neither expressly preempts Pennsylvania statutory or common law. Kiak v. Crown Equip. Corp., 989 A.2d 385, 391 (Pa. Super. Ct. 2010) (*quoting* 29 U.S.C. § 653(b)(4)). Second, it is well-settled that the Act's "purpose… is preventive rather than compensatory" and, as admitted by the Coopers themselves,[45] it "does not create a private cause of action against an employer for a violation [thereof]," *see* Ries v. Nat'l R.R. Passenger Corp., 960 F.2d 1156, 1164 (3d Cir. 1992) (citing numerous federal cases), meaning that the OSH Act certainly does not establish, in any capacity, a congressional intent to occupy the field of tort law. Finally, there is no conflict between 29 C.F.R. § 1910.1020 and the aforementioned two-year statute of limitations, since the former tasks employers with ensuring that their employees can access certain records throughout most or all of their lifetimes, which the latter does not impede by merely establishing the time window within which someone must file suit. Thus, the question before this Court was whether there was a genuine issue of material fact regarding whether the Coopers had filed their suit within two years of when they could have known, through reasonable diligence, of what they claim was AWI's and Dr. Hay's intentionally or recklessly tortious conduct.

In support of their effort to defeat the aforementioned summary judgment motions, the Coopers attempted to rebut the Appellees' statute of limitations argument by raising both the discovery rule and the fraudulent concealment doctrine, in essence maintaining that there are

---

treated in many respects as if it were so intended…Therefore, merely determining the degree of care is recklessness does not give rise to a separate tort that must have been pled within the applicable statute of limitations." Archibald v. Kemble, 971 A.2d 513, 519 (Pa. Super. Ct. 2009) (citations and quotation marks omitted).

[44] "There are three ways in which a state law may be preempted. First, state law may be preempted where the United States Congress enacts a provision which expressly preempts the state enactment. Likewise, preemption may be found where Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law. Finally, a state enactment will be preempted where a state law conflicts with a federal law. *Id.* Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law, or where the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Office of Disciplinary Counsel v. Marcone, 855 A.2d 654, 664 (Pa. 2004) (citations omitted).

[45] *See* Supplemental Brief #1 at ("29 C.F.R. 1910.1020 does not provide a private right of action. Nor do [the Coopers] assert a claim pursuant to… 29 C.F.R. 1910.1020.").

22

genuine issues of material fact as to whether the filing window was tolled, and whether their suit was thus initiated in a timely fashion. First, they claimed that it was not possible to ascertain the *precise* nature of Mr. Cooper's injuries until he was autopsied at some point in 2014. *See* Statement of Errors at 2; Supplemental Brief #1 at 40-41. Second, they argued that "AWI and Hay conspired in a series of [still ongoing] fraudulent acts, intentional omissions, and deliberate [record] destruction," which (depending on which of the Coopers' filings one happens to be reading) prevented Mrs. Cooper from learning of AWI's alleged duplicity until October 2011 or December 2011 and, independent of the federal preemption argument, continues to toll the statute of limitations. *See* Memorandum of Law in Support of AWI MSJ at 7; Supplemental Brief #1 at 40-41; *see also* Statement of Errors at 2.

Unfortunately, neither of these arguments provided a sufficiently substantive counter to the Appellees' requests for relief. Regarding the former, *actual* notice of an injury via a perfect, or nearly perfect, diagnosis is not required for a relevant statute of limitations to run, and a lack thereof does not, in itself, toll the period for filing suit; thus, the fact that Mrs. Cooper may not have known the *exact* nature of Mr. Cooper's malady until after his post-mortem examination is irrelevant, especially when the Coopers were aware as early as September 25, 2003 (i.e. the date of the Top Foam spill), and no later than Dr. Martin's November 2, 2010 assessment letter to the Coopers' attorney (which itself merely reinforced the diagnoses offered by Drs. Chaudhry, Cho, Fochtman, Gold, Gur, Newberg, and Thrasher), that Mr. Cooper had sustained a serious injury due to "occupational solvent exposure."[46] As to the latter, though the Coopers claimed that both AWI and Dr. Hay fraudulently withheld (and continue to withhold) critical documentation regarding Mr. Cooper's workplace exposure to chemicals, whatever merit this argument may have is undermined by a triumvirate of details: First, the Coopers requested these exposure records as early as December 2005, only to be refused by AWI, even though the OSH Act explicitly requires employers to provide such documentation, upon request, to affected employees;[47] second, Mrs. Cooper became aware in 2009 that Dr. Hay had assessed Mr. Cooper

---

[46] Moreover, and as noted above, given the WCA's near-blanket prohibition against common law actions based upon workplace injuries, the injuries allegedly caused to Mr. Cooper by the Top Foam spill, standing alone, could not form the foundation of a permissible suit.

[47] *See* note 36, *supra*.

23

during a May 2004 office visit, allegedly doing so without her knowledge, and had not provided either of the Coopers with his related notes during the intervening time; third, between November 17, 2007 and November 2, 2010, the Coopers were informed by no less than eight separate doctors that Mr. Cooper suffered from work-induced toxic encephalopathy and dementia. Thus, even when viewing the case record in the light most favorable to the Coopers, it is evident that they gained actual or constructive notice, at various points between late 2005 and late 2010, that: 1. AWI had violated the OSH Act by denying their initial, pre-Petition requests for Mr. Cooper's chemical exposure history, and had therefore prevented the Coopers from obtaining such information in a timely manner; 2. Dr. Hay's involvement in this matter had been hidden from Mrs. Cooper for roughly five years after Mr. Cooper's 2004 office visit; and 3. Mr. Cooper's progressively deteriorating state, on both a mental and physical level, was inextricably linked to his participation in the Top Foam spill cleanup, as well as to decades of chronic exposure to solvents and other chemicals at the Facility. Accordingly, this Court determined that there was no genuine issue of material fact as to the latest possible date upon which the Coopers knew, or should have known, each of these facts, and thus be put on notice of the Appellees' allegedly fraudulent and conspiratorial conduct: November 2, 2010 (i.e. the date of Dr. Martin's letter).

Given this, and in light of the aforementioned two-year statute of limitations, the Coopers were required to file their suit no later than November 2, 2012. Since the Coopers did not sue the Appellees until August 22, 2013, or nearly ten months beyond this deadline, their action was thus time-barred. As such, this Court properly granted each of the Appellees' respective Motions for Summary Judgment.

## III.  CONCLUSION

For the aforementioned reasons, this Court respectfully requests that the instant appeals be denied.

BY THE COURT:

_____

                                    J.

APPENDIX A

26

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT

CIVIL TRIAL DIVISION

SANDRA COOPER, IN HER OWN RIGHT, AND AS : 
PLENARY GUARDIAN OF GENE M. COOPER, AND :    AUGUST TERM, 2013
AND GENE M. COOPER

    PLAINTIFFS :    No. 02452

    v. :

:    JURY TRIAL DEMANDED

ARMSTRONG WORLD INDUSTRIES, INC. AND :
ALAN J. HAY, M.D., AND LANCASTER GENERAL :
OCCUPATIONAL MEDICINE :

    DEFENDANTS :

SANDRA COOPER, IN HER OWN RIGHT, :
AND AS ADMINISTRATRIX OF THE :    CIVIL ACTION – LAW
ESTATE OF GENE M. COOPER, :

    PLAINTIFFS :    OCTOBER TERM, 2014

VS. :    No. 02596

ARMSTRONG WORLD INDUSTRIES, INC., :    JURY TRIAL DEMANDED
ALAN J. HAY, M.D., AND LANCASTER :
GENERAL OCCUPATIONAL MEDICINE :

    DEFENDANTS :

Pa.R.A.P. 1925(b) Concise Statement of Issues Complained of on Appeal

COMES Plaintiffs/Appellants pursuant to the Order entered January 30, 2015, and attached hereto

as Exhibits 1 – 4, inclusive, and Pa.R.A.P. 1925(b) to respectfully file the herein Concise

Statement of Matters Complained of on Appeal:

I.    Concise Statement of Issues Complained of on Appeal:

Case ID: 130802452

A.   Whether a genuine issue of material fact exists in regard to Plaintiffs' notice of Defendants' fraud in February, 2008.

B.   Whether Defendants' fraud continued from 2008 through to December, 2014, thereby tolling the two-year statute of limitations for Fraud to December, 2016.

C.   Whether Defendants' fraud continued from 2008 through to February 6, 2015, thereby tolling the two-year statute of limitations for Fraud to February 6, 2017.

D.   Whether Plaintiffs-decedent's partial diagnosis of a brain injury in February, 2008 triggered the statute of limitations as to defendants' fraud to conceal the cause of Plaintiffs-decedent's brain damage.

E.   Whether Plaintiff, Sandra Cooper's Affidavit raised a genuine issue of material fact in regard to Plaintiffs' notice of Plaintiffs-decedent's injury in February, 2008.

F.   Whether the Trial Court erred by applying the two-year statute of limitations for Fraud to defendants' acts that occurred in February and December, 2014 and February, 2015.

G.   Whether the two-year statute of limitations for Fraud was tolled by Plaintiffs-decedent's protections pursuant to 29 C.F.R. 1910.1020 and 35 P.S. §§ 7301-7320.

H.   Whether Dr. Fredrick Fochtman's Affidavit raised a genuine issue of material fact in regard to whether the two-year statute of limitations for Fraud was tolled by Plaintiffs-decedent's protections pursuant to 29 C.F.R. 1910.1020 and 35 P.S. §§ 7301-7320.

Respectfully submitted:

/s/ George Chada, Esq.

---

Law offices of George Chada
221 Summit Drive
Natrona Heights, PA 15065-9710
412 370 8780
gchada@chadalaw.com

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT
### CIVIL TRIAL DIVISION

SANDRA COOPER, IN HER OWN RIGHT, AND AS :    AUGUST TERM, 2013
PLENARY GUARDIAN OF GENE M. COOPER, AND :
AND GENE M. COOPER

    PLAINTIFFS      :    No. 002452

    v.      :
     :    JURY TRIAL DEMANDED
ARMSTRONG WORLD INDUSTRIES, INC. AND :
ALAN J. HAY, M.D., AND LANCASTER GENERAL :
OCCUPATIONAL MEDICINE :

    DEFENDANTS      :

SANDRA COOPER, IN HER OWN RIGHT, :
AND AS ADMINISTRATRIX OF THE :    CIVIL ACTION – LAW
ESTATE OF GENE M. COOPER, :

    PLAINTIFFS      :    OCTOBER TERM, 2014

vs.      :    No. 02596
     :
ARMSTRONG WORLD INDUSTRIES, INC., :    JURY TRIAL DEMANDED
ALAN J. HAY, M.D., AND LANCASTER :
GENERAL OCCUPATIONAL MEDICINE :

    DEFENDANTS      :

## Certificate of Service

The undersigned hereby certifies that pursuant to Pa.R.C.P. 2054(G), a true and correct copy of the

herein Plaintiffs'/Appellants' Pa.R.A.P. 1925(b) Concise Statement of Issue Complained of on

Appeal was served on February 25, 2015 by email as set forth below and the undersigned further

hereby certifies that all unrepresented parties will be served in accordance with Pa.R.C.P. 440:

The Honorable Eileen Ceisler
City Hall, Room 229B
Philadelphia, PA 19107

Case ID: 130802452

Counsel for Defendant, Brenntag Northeast, Inc.
Montgomery, McCracken, Walker, Rhoads, LLP.
Attn: R. Hurst, Esq.
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

Attorney for Defendant, Armstrong World Industries, Inc.:
Barley Snyder
Attn: George C. Werner, Esq.
126 East King Street
Lancaster, PA 17602

Attorney for Defendant, Alan C. Hay, M.D.:
Eckerd Seamans Cherin & Mellott, LLC
Attn: Eileen Lampe, Esq.
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102

/s/ George Chada, Esq.
_____

# Exhibit 1

FILED

01 DEC 2014 10:04 pm

Civil Administration

A. WARREN

|  |  |
|---|---|
| SANDRA COOPER in her Own Right and as Plenary Guardian of GENE M. COOPER and GENE M. COOPER, | : Court of Common Pleas |
| | : Philadelphia County, Pennsylvania |
| Plaintiffs | : |
| v. | : August Term, 2013 |
| | : |
| ARMSTRONG WORLD INDUSTRIES, ET AL., | : No: 2452 |
| | : |
| Defendants | : |

DOCKETED

FEB 0 2 2015

F. CLARK
DAY FORWARD

## ORDER

AND NOW, this 30th day of ____, 2015, upon consideration of *Motion for Summary Judgment of Defendant, Alan J. Hay, M.D.*, and any response thereto, it is hereby,

ORDERED, that said Motion is GRANTED.

It is further ORDERED that the Amended Complaint is DISMISSED as against Dr. Hay, WITH PREJUDICE.

BY THE COURT:

_____ , J.

Cooper Etal Vs Armstrong World Industries. I-ORDER

14100259600032

Case ID: 1308O2452

Control No.: 14120375

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) F. BROWN-CLARK 02/06/2015

Case ID: 130802452

# Exhibit 2

Case ID: 130802452

FILED

01 DEC 2014 10:04 pm

Civil Administration

A. WARREN

SANDRA COOPER in her Own Right and
as Plenary Guardian of GENE M. COOPER
and GENE M. COOPER,

                    Plaintiffs

     v.

ARMSTRONG WORLD INDUSTRIES,
ET AL.,

                    Defendants

: Court of Common Pleas

: Philadelphia County, Pennsylvania

: August Term, 2013

: No: 2452

: 

: 

**DOCKETED**

FEB 0 2 2015

F. CLARK
DAY FORWARD

## ORDER

AND NOW, this 30th day of Nov, 2015, upon consideration of *Motion for Summary Judgment of Defendant, Alan J. Hay, M.D.,* and any response thereto, it is hereby,

ORDERED, that said Motion is GRANTED.

It is further ORDERED that the Amended Complaint is DISMISSED as against Dr. Hay, WITH PREJUDICE.

BY THE COURT:

                                 , J.

Cooper Etal Vs Armstron-ORDER

13080245200119

Case ID: 130802452
Control No.: 14120375

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) F. BROWN-CLARK 02/06/2015

Case ID: 130802452

| | |
|---|---|
| SANDRA COOPER in her Own Right and & as Plenary Guardian of GENE M. COOPER, and GENE M. COOPER<br>Plaintiffs,<br><br>vs.<br><br>ARMSTRONG WORLD INDUSTRIES, et al.,<br>Defendants. | IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA<br><br>TERM AUGUST 2013<br><br>No. 2452 |

**DOCKETED**

FEB 0 2 2015

F. CLARK
DAY FORWARD

## ORDER

AND NOW, this 30th day of _____, 2015, upon consideration of

Armstrong World Industries, Inc.'s Motion for Summary Judgment and any response thereto,

this Court hereby GRANTS Armstrong World Industries, Inc.'s Motion and enters judgment in

favor of Armstrong World Industries, Inc. and against Plaintiffs.

BY THE COURT:

_____
                                    J.

Cooper Etal Vs Armstron-ORDER

13080245200120

Case ID: 130802452
Control No.: 14120621

Case ID: 130802452

# Exhibit 4

Case ID: 130802452

**FILED**
01 DEC 2014 04:41 pm
**Civil Administration**
S. MACGREGOR

SANDRA COOPER in her Own Right and & as Plenary Guardian of GENE M. COOPER, and GENE M. COOPER
Plaintiffs,

vs.

ARMSTRONG WORLD INDUSTRIES, et al.,
Defendants.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA

TERM AUGUST 2013

No. 2452

**DOCKETED**

FEB 0 2 2015

F. CLARK
DAY FORWARD

## ORDER

AND NOW, this 30th day of _____, 2015, upon consideration of Armstrong World Industries, Inc.'s Motion for Summary Judgment and any response thereto, this Court hereby GRANTS Armstrong World Industries, Inc.'s Motion and enters judgment in favor of Armstrong World Industries, Inc. and against Plaintiffs.

BY THE COURT:

_____
J.

Cooper Etal Vs Armstrong World Industries, I-ORDER

14100259600033

Case ID: 130802452
Control No.: 14120621

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) F. BROWN-CLARK 02/06/2015

Case ID: 130802452